UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| BILLY L. BISEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:11-CV-00221 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Billy Bisel appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Bisel applied for DIB in September 2004, alleging disability as of February 5, 2002. (Tr.

115-17.)  Bisel's DIB-insured status expired on December 31, 2008 (Tr. 127), and thus he must

establish that he was disabled by that date. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir.

1997).  The Commissioner denied his application initially and upon reconsideration, and Bisel

requested an administrative hearing. (Tr. 93-98, 105-14.)  On February 7, 2007, a hearing was

conducted by Administrative Law Judge ("ALJ") John Pope, at which Bisel (who was

represented by counsel), his mother, and a vocational expert ("VE") testified. (Tr. 953-1006.)

---

[1] All parties have consented to the Magistrate Judge. (Docket # 11); *see* 28 U.S.C. § 636(c).

On September 18, 2007, the ALJ rendered an unfavorable decision to Bisel, concluding that he was not disabled. (Tr. 82-92.)  The Appeals Council later vacated the ALJ's decision and remanded the case. (Tr. 67-69.)

On July 16, 2009, a second hearing was conducted by the ALJ, at which Bisel (who was represented by counsel), a medical expert, and a VE testified. (Tr. 1007-54.)  On December 16, 2009, the ALJ again issued an unfavorable decision to Bisel. (Tr. 14-32.)  After the Appeals Council denied Bisel's request for review (Tr. 4-6), the ALJ's decision became the final decision of the Commissioner.

Bisel filed a complaint with this Court on July 1, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  Bisel advances two arguments in this appeal: (1) that the ALJ erred by failing to incorporate his finding that Bisel had moderate difficulties in social functioning into the hypothetical posed to the VE at step five; and (2) that the ALJ improperly discounted the credibility of his symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15-20.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

As of his date last insured, Bisel was forty-one years old; had a high school equivalency diploma; and possessed work experience as a general repairman, general laborer, and truck driver. (Tr. 30, 115, 140, 144.)  Bisel alleges that he is disabled due to cervical disk disease, lumbar disk disease, coronary artery disease, obesity, adjustment disorder with anxiety and depression, and post-traumatic stress disorder ("PTSD"). (Opening Br. 2.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 1054-page administrative record necessary to the decision.

At the hearing, Bisel, who weighed 245 pounds and was 5'11" tall, stated that he lives with his wife and two sons in a one-story home. (Tr. 1014.)  He performs his self care independently, but at a slow pace; prepares simple meals; grocery shops with his wife once or twice a month; and occasionally does laundry and dishes but not vacuuming or sweeping. (Tr. 1016.)  He stated that on a good day he spends three to four hours in the morning helping with household chores, goes with his son to football practices after school, and then watches television in the evening. (Tr. 1015-16.)  Bisel reported that he has about one bad day a week in which he spends all day in bed. (Tr. 1016.)

Bisel further testified that he has no hobbies and only sees people about once a month. (Tr. 1016.)  He complained of having a short temper, sleeping problems, and flashbacks from the war, attributing them to PTSD. (Tr. 1016.)  He stated that he has difficulty maintaining concentration and in getting along with people because of his volatility; therefore, he tries to stay away from people as much as possible. (Tr. 1017-18.)  He has taken medication for these symptoms at times, but was not doing so at the time of the hearing. (Tr. 1016.)

Physically, Bisel stated that he experiences constant, severe headaches; a "knife-like" pain in his neck and shoulders; and a chronic, dull pain in his lower back and right leg. (Tr. 1017, 1021-22.)  His right foot is "numb and tingly" most of the time. (Tr. 1017.)  His pain worsens with bending, raising his arms, and turning his neck, but is reduced somewhat by lying down or taking a hot shower. (Tr. 1017.)  He estimated that he could lift between fifteen and twenty pounds, walk two hours, stand one to one-and-a-half hours, and sit for one hour; he also reported difficulty with operating foot controls. (Tr. 1017.)  Several times a week, Bisel has to lie down and "take it easy" due to headaches. (Tr. 1023-24.)  He elaborated that he does not take

pain medication all the time; rather, he takes it only when "the pain is so bad that [he] can't walk or . . . function," which is generally two or three times a week. (Tr. 1023.)

*B. Summary of the Relevant Medical Evidence*

Prior to his enlisting in the Army, Bisel had a long history of right knee pain and swelling due to Osgood-Schlatter's disease. (Tr. 344.)  In 2000, Bisel started experiencing constant low back pain when he was in basic training; this pain continued for the next two years. (Tr. 343.)  In January 2002, Bisel fell in a fox hole, hurting his neck and aggravating his right knee pain. (Tr. 344.)  About that same time, he injured his right shoulder while throwing hand grenades. (Tr. 344.)

In March 2002, Bisel underwent a C6-7 anterior cervical discectomy and fusion with allograft and plating. (Tr. 275, 343, 367.)  In January 2003, he had a second surgery—an explanation of hardware at C6-7 and a C5-6 anterior cervical diskectomy and fusion with allograft and plating. (Tr. 243.)

In 2003, Bisel experienced global pain in his right shoulder every day, which worsened with resistant work or overhead activity. (Tr. 344.)  In September 2003, a series of x-rays showed degenerative and postoperative changes in his spine, but no acute fracture or dislocation to his right knee or shoulder. (Tr. 392-95.)  In December 2003, an MRI of his spine showed a mild disk bulge at L5-S1 without significant neurologic effect. (Tr. 390.)

In March 2004, Bisel was seen at the Veteran's Administration ("VA") Hospital in Fort Wayne, reporting that his pain had improved with Duragesic patches but that he was having trouble sleeping. (Tr. 407.)  He was prescribed Restoril for insomnia. (Tr. 407.)  In June 2004, a PTSD screen was positive, but Bisel refused a PTSD consult. (Tr. 423.)  In August 2004, Bisel

4

was screened for PTSD and depression, and both screens were positive. (Tr. 384.)

In November 2004, Bisel was examined by Dr. Yaroslav Pogorelov at the request of the Social Security Administration. (Tr. 433-36.)  Bisel rated his upper back pain as an "eight" out of "ten" and also reported pain associated with left arm numbness and headaches. (Tr. 433.)  He complained of depression and insomnia and stated that his medications were not helping him. (Tr. 433.)  On physical exam, Bisel's gait was antalgic and slow, and he had a positive straight leg raising test. (Tr. 434.)  His spine was tender to palpitation. (Tr. 434.)  Dr. Pogorelov opined that Bisel was unable to stand or walk for two hours in an eight-hour day, walk or sit for ten minutes at a time, or walk for fifteen minutes at a time. (Tr. 434.)  He also thought that Bisel would have some difficulty with lifting, carrying, and handling objects. (Tr. 435.)  He diagnosed Bisel with upper back pain, depression, and alcoholism. (Tr. 434.)

That same month, Bisel was evaluated by Dr. Kenneth Bundza at the request of the Social Security Administration. (Tr. 437-40.)  Dr. Bundza found that Bisel described symptoms associated with PTSD and depression, including startle response, avoidance, recurring dreams of life-threatening events, sleep disturbance, weight loss, irritability, isolation, and anhedonia. (Tr. 437.)  Bisel denied any suicidal ideation. (Tr. 437.)  Dr. Bundza noted that Bisel faced several severe psychosocial stressors, including his combat experience and injuries, a divorce, and a child-custody dispute. (Tr. 437.)  He denied receiving any formal psychiatric treatment for his emotional problems, other than medication. (Tr. 437.)

Dr. Bundza did not find Bisel to be in any acute emotional distress or have any marked cognitive or intellectual impairments, and Bisel's overall demeanor suggested that he was "extremely cynical." (Tr. 437-38.)  Dr. Bundza thought that Bisel's current emotional problems

were being exacerbated by his situational problems and that he did not intend to actively seek

mental health services. (Tr. 439.)  Dr. Bundza assigned Bisel a current Global Assessment of

Functioning ("GAF") score of 50 and diagnosed him with PTSD and major depressive disorder,

single episode, severe without psychotic features.[3] (Tr. 440.)  He thought the prognosis for any

significant improvement was guarded or poor. (Tr. 439.)

On December 3, 2004, F. Kladder, Ph.D., a state agency psychologist, reviewed Bisel's

record and opined that Bisel had an affective disorder and an anxiety-related disorder. (Tr. 441-

57.)  He concluded that Bisel had moderate difficulties in social functioning and mild limitations

in daily living activities and in maintaining concentration, persistence, or pace. (Tr. 451.)  More

specifically, Dr. Kladder found that Bisel was "not significantly limited" in nineteen out of

twenty mental activities, but was "moderately limited" in his ability to maintain socially

appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 455-56.)

He concluded that Bisel was capable of performing simple, repetitive tasks. (Tr. 457.)  Dr.

Kladder's opinion was later affirmed by a second state agency psychologist. (Tr. 457.)

Also in December 2004, Dr. J. Corcoran, a state agency physician, reviewed Bisel's

record and found that he could lift and carry up to twenty-five pounds frequently and fifty

pounds occasionally; stand or walk for about six hours in an eight-hour workday; and sit for six

hours in a workday. (Tr. 460-67.)  Dr. Corcoran further found that Bisel's ability to reach in all

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Id.  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

directions was limited and that he must avoid concentrated exposure to vibration. (Tr. 464.)  This opinion was later affirmed by a second state agency physician. (Tr. 467.)

In March 2005, Bisel complained to the Marion VA of persistent and worsening neck and low back pain. (Tr. 590.)  It was noted that he had tried several anti-inflammatory and narcotic pain medications with poor results. (Tr. 590.)  That same month, Bisel was hospitalized after an acute anterolateral wall myocardial infarction. (Tr. 484.)  Cardiac catheterization showed narrowing of some coronary arteries, and Bisel underwent angioplasty and stent placement. (Tr. 484.)  In April, Bisel was seen by a cardiologist at the VA. (Tr. 583.)  Bisel reported occasional mid-sternal pain with exertion, but denied any shortness of breath. (Tr. 583.)

In May 2005, Bisel was in a motorcycle accident and was treated at the VA. (Tr. 579.)  In July, he reported that he was feeling well with no new complaints. (Tr. 569.)  He had stopped using the Duragesic and Fentanyl patches because they were causing him headaches. (Tr. 569.)  A screen for PTSD in June 2005 was negative. (Tr. 571-72.)  In October 2005, Bisel told the Marion VA that he continued to have pain that was not relieved by his medication. (Tr. 563.)

In February 2006, Bisel saw a neurologist for his neck and back pain, who diagnosed him with chronic pain and referred him to a neurosurgeon. (Tr. 558-59.)  In March 2006, Bisel took a stress test, which indicated abnormal resting electrocardiogram, submaximal stress, and negative stress electrocardiogram at the level of activity. (Tr. 553-54.)  A screen for PTSD in September 2006 was negative. (Tr. 603.)

In February 2007, Bisel told Dr. Vitug at the VA that he had seen a neurosurgeon in Ann Arbor, who did not recommend surgery. (Tr. 796.)  In November 2007, Bisel had a myocardial perfusion test, which indicated two perfusion defects and a left ventricular ejection fraction of

46%. (Tr. 682-83.)  The following month, Bisel underwent another cardiac catheterization due to chest pain and an abnormal stress test. (Tr. 802.)  The results showed no significant obstruction in coronary arteries, normal global lower ventricle systolic function, and regional wall abnormalities. (Tr. 803.)

In August 2007, Bisel was evaluated by a physical therapist. (Tr. 807.)  He reported radicular symptoms down both legs, right greater than left, and numbness and tingling in both legs and feet. (Tr. 807.)  He was taking Vicodin for pain. (Tr. 807.)  On physical exam, his trunk range of motion was limited in flexion by 50%, and he had tenderness to palpitation at L2-5. (Tr. 807.)

In February 2008, Bisel was evaluated by Dr. Birgitte Miller, a psychiatrist. (Tr. 749-54.) Bisel was adamant that his problems were not PTSD-related and told Dr. Miller that he currently had through the VA an 80% service-connected disability while being 100% unemployable, but that he would really like to go back to work. (Tr. 749-50.)  Bisel told Dr. Miller that he could not stand people so he did not like going where there may be crowds, such as the shopping mall or restaurants, and that he frequently checked the perimeter. (Tr. 750.)  He also confided that he could be very demanding and did not like people telling him what to do. (Tr. 750.)

On mental status exam, Dr. Miller observed that Bisel appeared quite irritated. (Tr. 752.) On the Beck Depression Inventory II, Bisel scored 27, which was in the moderate range. (Tr. 753.)  On the PCL-M, he scored 54, which was suggestive of PTSD. (Tr. 753.)  On the Beck Anxiety Index, he scored 34, which was in the severe range. (Tr. 753.)  Dr. Miller assigned a diagnosis of adjustment disorder with anxiety and depression, rule out PTSD, and rule out depression/dysthymia, and estimated his GAF score at 54. (Tr. 753.)

In May 2008, Bisel reported that his pain was more severe and that his current pain medications were not effective. (Tr. 751.)  He also complained of severe muscle cramps in his legs. (Tr. 751.)  He had been on opioid therapy for three or more months at the time. (Tr. 751.) In July 2008, Bisel returned to Dr. Miller for counseling. (Tr. 822.)  In September 2008, x-rays of Bisel's knees showed likely changes of prior Osgood-Schlatter's disease and small joint effusion. (Tr. 912.)  That same month, he saw Dr. Shah for his headaches. (Tr. 210.)  Dr. Shah thought the headaches were secondary to his use of Vicodin and also due to tenderness in the cervical spine. (Tr. 210.)

In January 2009, Bisel saw Dr. Miller for a second session of counseling. (Tr. 896.)  At the hearing on July 16, 2009, Dr. Paul Boyce testified that Bisel could lift or carry no more than ten pounds frequently and twenty pounds occasionally; could lift no weight overhead; and could push, pull, and operate vibratory tools only occasionally. (Tr. 1035-37.)  He could stand or walk for up to six hours, and there were no restrictions on sitting other than the usual breaks during the workday; he could occasionally climb ramps and stairs, bend, stoop, and crouch, but never crawl or climb ropes, ladders, or scaffolds. (Tr. 1035.)  Dr. Boyce further opined that Bisel could reach down frequently, but only occasionally overhead without any weight, and that he could not work with hazardous machinery. (Tr. 1035-37.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On December 16, 2009, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 14-32.)  He found at step one of the five-step analysis that Bisel had not engaged in substantial gainful activity from his alleged onset date through his date last insured. (Tr. 16.)  At step two, the ALJ found that Bisel had the following severe impairments: cervical disk disease with two surgeries, lumbar disk disease, coronary artery disease, obesity, adjustment disorder with anxiety and depression, and PTSD. (Tr. 16.)  At step three, the ALJ determined that Bisel's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 18.)

Before proceeding to step four, the ALJ determined that Bisel's symptom testimony was

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

not reliable to the extent it was inconsistent with the following RFC:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work . . ., with the following exceptions: the claimant must not lift overhead; may push/pull occasionally with the upper extremities; may occasionally climb ramps and stairs, bend, stoop, and crouch; must never climb ladders, ropes, or scaffolds, or crawl; may frequently reach forward and occasionally reach overhead; and must avoid all exposure to hazards. The claimant must also only occasionally use vibratory tools. The claimant must be limited to unskilled work.

(Tr. 21.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Bisel was unable to perform any of his past relevant work. (Tr. 30.) The ALJ then concluded at step five that through his date last insured Bisel could perform a significant number of other light, unskilled jobs within the economy, including cashier, folder, and mail clerk. (Tr. 32.) Accordingly, Bisel's claim for DIB was denied. (Tr. 31.)

### C. The ALJ's Step Five Finding Is Supported by Substantial Evidence

Bisel first argues that the ALJ erred when posing a hypothetical to the VE at step five, maintaining that the ALJ failed to include his earlier finding that Bisel had moderate deficiencies in social functioning. Bisel's argument, however, does not warrant a remand of the Commissioner's final decision.

To explain, at step two of the five-step sequential analysis, the ALJ must determine whether a claimant's impairment(s) is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). In determining the severity of a claimant's mental impairments at step two of his five-step analysis, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001

WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). The Seventh Circuit Court of Appeals has

stated that the ALJ must then "incorporate" these limitations into the hypothetical questions

posed to the VE at step five. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)

(finding that the ALJ erred when his hypothetical question to the VE failed to take into account

his finding at step two that the claimant had deficiencies in social functioning and concentration,

persistence, and pace); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) (remanding case

where the ALJ failed to adequately account for the claimant's social limitations in the RFC); *see

also Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003). Stated more broadly, "to the

extent the ALJ relies on testimony from a vocational expert, the question posed to the expert

must incorporate *all* relevant limitations from which the claimant suffers." *Kasarsky*, 335 F.3d at

543-44 (emphasis added).

At step three, the ALJ found that Bisel had moderate difficulties in social functioning, as

well as minimal difficulties in maintaining concentration, persistence, or pace. (Tr. 18-20.) After

determining that Bisel's mental impairments were significant enough to be "severe" but not

severe enough to meet a listing-level impairment, the ALJ assigned him an RFC limiting him to

"unskilled work." (Tr. 21.) Contrary to Bisel's argument, the ALJ adequately accounted for his

deficiencies in social functioning and concentration, persistence, or pace by assigning him an

RFC limiting him to "unskilled work," a limitation that was then properly incorporated into the

ALJ's hypothetical to the VE.

Significantly, in assigning the RFC for unskilled work, the ALJ relied upon the opinion

of Dr. Kladder, the state agency psychologist who reviewed Bisel's record and concluded that

although he had moderate difficulties in social functioning and mild difficulties in maintaining

concentration, persistence, or pace, he could still perform work involving simple, repetitive

tasks. (Tr. 441-57.)  More specifically, the ALJ summarized Dr. Kladder's opinion as follows:

> [Dr. Kladder] found that the claimant was irritable and easily angered but okay in
> public and in taking instruction.  The examiner noted that the claimant was able to
> attend and focus on activities.  He opined that most of the claimant's limitations
> were because of his physical condition.  Ultimately, the psychologist opined that
> the claimant had the mental residual functional capacity for simple and repetitive
> tasks.  The undersigned notes that this opinion comports with the findings of the
> consultative examiner and the VA psychologist, who conducted the only two
> comprehensive mental status examinations on record.  The consultative examiner,
> for example, noted that the exam did not indicate the presence of any marked
> cognitive or intellectual impairments.  As the only medical opinion on record
> concerning the claimant's mental impairments, and because it is consistent with
> the record as a whole, the undersigned accords great weight to the state agency's
> psychological opinion and has included the restriction to unskilled work in the
> claimant's residual capacity assessment.

(Tr. 30.)

The instant circumstances are analogous to the facts confronting the Seventh Circuit in

*Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).  In that case, the ALJ determined

that the claimant was moderately limited in his ability to maintain a regular schedule and

attendance and in his ability to complete a normal workday and workweek without interruptions

from psychologically-based symptoms. *Id.*  In posing a hypothetical to the VE, the ALJ relied

upon the opinion of a consulting physician who stated that because the claimant was not

significantly limited in seventeen of twenty work-related areas of mental functioning, he retained

the mental RFC to perform "low-stress, repetitive work." *Id.*  The Court of Appeals concluded

that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's

moderate mental limitations, articulating that the consulting physician had essentially "translated

[his] findings into a specific RFC assessment, concluding that Johansen could still perform low-

stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir.

14

2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Dr. Kladder essentially "translated [his] findings into a specific RFC assessment." 314 F.3d at 288. That is, Dr. Kladder concluded that, despite Bisel's moderate difficulties in social functioning and minimal difficulties in maintaining concentration, persistence, or pace, he could still perform simple, repetitive tasks. (Tr. 457.)

But Bisel notes, and correctly so, that the ALJ's RFC does not reflect Dr. Kladder's specific translation of his clinical findings because it limits him to "unskilled work," rather than "simple, repetitive tasks." (Tr. 591.) Indeed, some courts have stated that "[o]nly if a doctor used the descriptive language to describe what work a claimant can perform in spite of [his] limitations can the ALJ use those terms in the RFC or hypothetical questions the VE." *Coots v. Astrue*, No. 08-cv-2197, 2009 WL 3097433, at *8 (C.D. Ill. Sept. 22, 2009) (citing *Johansen*, 314 F.3d at 289); *see also Conley v. Astrue*, 692 F. Supp. 2d 1004, 1008-09 (C.D. Ill. 2010). And, the Seventh Circuit has found a hypothetical flawed where it "purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant] could perform." *Young*, 362 F.3d at 1004 n.4; *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Everroad v. Astrue*, No. 4:06-cv-100, 2007 WL 2363375, at *8 (S.D. Ind. Aug. 10, 2007) ("By using conclusory language to describe [the claimant's] limitations, the ALJ did not allow the expert to make a reliable determination about what work the claimant could perform.").

Although it would have been most prudent for the ALJ to mirror Dr. Kladder's translation with specificity, in this particular instance the ALJ's RFC for "unskilled work" is adequately supported by the record. "Unskilled work" is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a); *see Jelinek v. Astrue*, 662 F.3d 805, 813-14 (7th Cir. 2011). The Social Security Administration further articulated that the following mental activities are generally required to perform unskilled work: understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work (i.e., simple work-related decisions); responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. SSR 96-9p, 1996 WL 374186, at *9; *see Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) ("[W]here the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, then an RFC of 'unskilled' work would be appropriate.").

Here, Dr. Kladder's opinion specifically addressed Bisel's limitations with respect to these mental activities. He opined that Bisel was "not significantly limited" in nineteen of twenty categories of mental activities, including the ability to understand and remember simple instructions, make simple work-related decisions, respond appropriately to criticism from supervisors, get along with coworkers or request assistance, and respond appropriately to changes in the work setting. (Tr. 455-56.) The only category that Dr. Kladder found Bisel to be "moderately limited" in was the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 455.) Indeed, Dr. Kladder specifically

16

articulated that he thought most of Bisel's limitations were attributable to his physical complaints. (Tr. 457.)

In any event, during cross examination by Bisel's counsel, the VE specifically testified that an individual of Bisel's age, education, experience, and RFC could perform approximately 250,000 to 300,000 light, unskilled jobs that require only "occasional or limited contact" with co-workers and supervisors and no contact with the public, including the positions of folder, mail clerk, and packager. (Tr. 1050-52.)  Therefore, even if the ALJ erred by failing to include a specific limitation about Bisel's social difficulties into the RFC, any such error was ultimately harmless, as Bisel's attorney properly re-focused the VE's attention on these social limitations upon cross examination. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case"); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

To reiterate, "an ALJ is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))).  Because Dr. Kladder translated Bisel's moderate difficulties in social functioning and minimal difficulties in maintaining concentration, persistence, or pace into an RFC that reflected the capacity to

17

perform the mental activities identified by the Social Security Administration for "unskilled work," substantial evidence supports the ALJ's step-five finding. *See, e.g.*, *Karger v. Astrue*, 566 F. Supp. 2d 897, 909 (W.D. Wis. 2008) (affirming ALJ's decision where the record indicated that the claimant had the prerequisite mental abilities necessary to perform "unskilled" work); *Orucevic v. Astrue*, No. C07-1981 CRD, 2008 WL 4621420, at *7 (W.D. Wash. Oct. 16, 2008) (affirming the ALJ's decision limiting the claimant to "unskilled" work where the record indicated she could perform "simple, repetitive tasks," observing that the Social Security Administration's definition of "unskilled" work "describes repetitive tasks as the primary work duty").

Therefore, Bisel's first argument—that the hypothetical posed to the ALJ at step five did not account for his moderate difficulties in social functioning and minimal difficulties in concentration, persistence, or pace—does not warrant a remand of the Commissioner's final decision.[5]

### D.  The ALJ's Credibility Determination Will Not Be Disturbed

Bisel also contends that the ALJ erred by discounting the credibility of his symptom testimony concerning his impairments.  Specifically, Bisel claims that the ALJ erred by cherry-picking the evidence about his pain complaints and in improperly discounting the testimony of

---

[5] Bisel also raises a cursory argument that an RFC for unskilled work is inconsistent with the GAF score of 50 assigned by Dr. Bundza. (Opening Br. 16; Reply Br. 2.)  But "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [his] GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished).  Rather, "GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability." *Curry v. Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010).  Furthermore, the ALJ specifically mentioned the GAF score of 50 assigned by Dr. Bundza, as well as the score of 54 assigned by Dr. Miller, and thus certainly did not turn a blind eye to such evidence. *Cf. Ingle v. Astrue*, No. 10-cv-1002, 2011 WL 5834273, at *7 (S.D. Ill. Oct. 28, 2011) (finding that the ALJ erred by "cherry-picking" the claimant's highest GAF score and ignoring the remaining scores).  Therefore, Bisel's argument concerning the GAF score of 50 is not pivotal.

his social difficulties solely because he expressed a desire to work. (Opening Br. 18-19.)  Bisel's challenge to the ALJ's credibility determination is ultimately unpersuasive.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Contrary to Bisel's assertion, when assessing the credibility of his complaints the ALJ thoroughly considered the evidence of record pertaining to his physical and psychological conditions. (Tr. 17-30.)  In particular, the ALJ noted that the severity of Bisel's complaints concerning his right rotator cuff and nerve damage problems were "not borne out by the medical record," as the rotator cuff issue was of short duration and a nerve conduction study was normal. (Tr. 17.)  He further observed that the objective medical evidence pertaining to Bisel's cardiac condition and cervical and lumbar spine problems was consistent with an RFC for light work, rather than total disability. (Tr. 23-25, 30.)

And as to his psychological issues, the ALJ referenced Dr. Bundza's examination that found no marked cognitive or intellectual impairments, intact memory, or socially appropriate

behavior, and noted that Bisel's situational problems at the time, namely his divorce and custody dispute, were exacerbating any emotional problems. (Tr. 27.) Of course, an ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility and "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p.

The ALJ further observed that although Bisel complained of severe back pain and some numbness, he took narcotic pain medication only occasionally and no medications for neuropathy. (Tr. 23.) He also at least twice declined referral to a weight management program and, although he participated in some physical therapy, eventually stopped scheduling those appointments. (Tr. 23, 25.) And as to his mental complaints, Bisel received only sporadic mental health treatment and attended just two counseling sessions; the ALJ further observed that according to Bisel's most recent prescription reports, he was not taking any psychiatric medication. (Tr. 26-27.) The ALJ is entitled to consider the type of treatment that a claimant has undergone when determining that claimant's credibility. *See Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints of debilitating fatigue given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 404.929(c)(3)

(considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p; *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009).

The ALJ also properly considered Bisel's activities of daily living when assessing the credibility of his symptom testimony, noting that on a good day he performs a variety of activities each day, including household chores, helping his son with homework and attending his football practice, going grocery shopping on occasion, and visiting the American Legion several times a year. (Tr. 19-20, 22); *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  But the ALJ also considered Bisel's testimony that his physical limitations cause him to perform these activities at a slower pace (Tr. 20) and that he has one bad day a week when he stays in bed all day (Tr. 22).  Thus, the ALJ did not cherry-pick the evidence concerning Bisel's pain and daily living activities, but rather, considered the record fairly. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) ("If the ALJ were to ignore *an entire line of evidence*, that would fall below the minimal level of articulation required." (emphasis added)).

And the ALJ also took note of some inconsistent statements in the record.  He observed that although Bisel stated that he tries to stay away from people and cannot get along with anyone (Tr. 22), he attends his son's football practice regularly (Tr. 22) and Bisel's mother represented during the application process that he gets along well with neighbors, has at least one good friend from the military, and engages in conversations in public if others initiate them (Tr. 23 (citing Tr. 154-55)). *See Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D.

Ill. Jan. 9, 2003) (discounting a claimant's credibility due to inconsistent statements); SSR 96-7p.

The ALJ, however, also considered Bisel's alleged near-inability to get along with others as inconsistent with several statements in the record indicating that he desires to find employment. (Tr. 27.)  Bisel challenges this assertion, and the Court agrees that the ALJ's reasoning in this respect is difficult to trace, as the *desire* to work does not necessarily equate with an *ability* to work. *See, e.g.*, *Newton v. Apfel*, 209 F.3d 448, 455 n.3 (5th Cir. 2000). Nevertheless, when reading the ALJ's opinion as a whole, which the Court is required to do, *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), the ALJ's credibility determination is still amply supported by the other evidence of record discussed above concerning the objective medical evidence, treatment, activities of daily living, and inconsistent statements. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (acknowledging that the ALJ's credibility determination was "not without fault" in two respects, but affirming it based other substantial evidence cited by the ALJ).  Therefore, although the ALJ's credibility determination is not perfect, it is not "patently wrong" and thus will be affirmed. *Kittelson v. Astrue*, 362 F. App'x 553, 558 (7th Cir. 2010) (unpublished) (affirming the ALJ's adverse credibility finding where substantial evidence supported it even though it "was not perfect").

In sum, the ALJ adequately considered the credibility of Bisel's symptom testimony in accordance with the factors identified in 20 C.F.R. § 404.1529(c) and ultimately determined that his symptoms were not of disabling severity.  In doing so, the ALJ adequately built, for the most part, an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000);

*Powers*, 207 F.3d at 435.  Therefore, the ALJ's credibility determination, which is entitled to

special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

Clerk is directed to enter a judgment in favor of the Commissioner and against Bisel.

SO ORDERED.

Enter for this 17th day of July, 2012.

S/Roger B. Cosbey          
Roger B. Cosbey,
United States Magistrate Judge